**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Patricia A Schuler, | No. CV-15-01565-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Banner Health, et al., | |
| Defendants. | |

Plaintiff Patricia A. Schuler has difficulty hearing and uses a hearing aid. In 2014, Schuler began working for Defendant Banner Health.[1] Schuler believes Banner failed to accommodate her disability and later terminated her because of her disability. Viewing the facts in the light most favorable to Schuler, she was responsible for Banner's alleged failure to accommodate her disability, she has no evidence establishing she was terminated because of her disability, and Banner did not retaliate against her for engaging in protected activity. Therefore, Banner is entitled to summary judgment on all of Schuler's claims.

## BACKGROUND

Most of the relevant facts are undisputed. Unless otherwise noted, the following summary presents the facts in the light most favorable to Schuler.

Schuler was diagnosed with hearing problems at the age of five. At present, she has "moderate to severe hearing loss in her right ear and is functionally deaf in her left

---

[1] The remaining defendants are "Banner Health" and "Banner Good Samaritan Hospital." The parties do not differentiate between the two and it appears unnecessary to do so.

ear." (Doc. 92-1 at 14-15). Schuler uses a hearing aid in her right ear and, with that aid, is able to understand speech provided it is at a "comfortable loudness level." (Doc. 92-2 at 4).

In 2008, Schuler began working as a psychometrist. (Doc. 93-2 at 2). Psychometrists administer and score psychological and neuropsychological tests under the supervision and direction of a clinical psychologist or clinical neuropsychologist. (Doc. 20 at 1). Those tests "assess various aspects of cognition such as memory, attention, language, speed of thinking, and problem solving abilities." (Doc. 88 at 2). The test results are used by a psychologist or neuropsychologist "to determine which parts of a patient's brain are not functioning as expected." (Doc. 88 at 2). These tests are often conducted verbally and a psychometrist often must be able to interact with patients and respond to statements made by patients.

From 2008 to 2013, Schuler worked as a psychometrist in Ohio. On January 9, 2014, Schuler accepted a psychometrist position with Banner in Phoenix. (Doc. 88-1 at 88). Schuler moved to Phoenix and began working at Banner on February 10, 2014.[2] (Doc. 88-1 at 8). Schuler's supervisor at Banner was Dr. Jennifer Bortz, a neuropsychologist. (Doc. 88-1 at 9). One of Schuler's coworkers was Sheila Vadovicky, a part-time psychometrist. Dr. Bortz's procedure with new psychometrists was to "conduct practice sessions" and directly observe the psychometrist's "test administration skills." (Doc. 88-2 at 3). Dr. Bortz followed that procedure when Schuler started work by observing tests administered by Schuler and providing feedback based on those tests.

---

[2] Banner allegedly has a policy requiring new hires complete a "Conditional Period of employment to demonstrate that they have the skills necessary to perform the job for which they were hired." (Doc. 87 at 3). Schuler claims she was unaware of this policy and seems to argue it should not have been applied to her. The parties have not explained why it matters whether Schuler was subject to the "Conditional Period" policy. It is undisputed Schuler was hired as "an at-will employee." (Doc. 88-1 at 88). Thus, Schuler could "be terminated at any time for good cause or no cause," regardless of her being in the initial "Conditional Period." *Demasse v. ITT Corp.*, 984 P.2d 1138, 1142 (Ariz. 1999). The fact that Banner may not have communicated its policy regarding a "Conditional Period of employment" appears irrelevant.

- 2 -

(Doc. 88-2 at 3). Vadovicky also observed Schuler's work and provided her with feedback.

The parties have not provided a complete picture of the interactions between Schuler, Dr. Bortz, and Vadovicky but the record establishes there were difficulties very shortly after Schuler started working.[3] In Banner's view, most of those difficulties stemmed from Dr. Bortz's observations of Schuler's testing and disagreements over the manner in which tests should be administered. On an unidentified date prior to March 6, 2014, Dr. Bortz observed Schuler's administration of a memory test. On March 6, Dr. Bortz sent Schuler an email stating she hoped they could "do another run-through on memory test administration" to address issues Dr. Bortz had identified. (Doc. 88-2 at 14). On March 10, 2014, Dr. Bortz sent Schuler an email stating they needed to discuss "responses and patterns in test administration" and Schuler should speak with Dr. Bortz before proceeding with tests. (Doc. 88-2 at 16).

On March 12, 2014, Schuler administered a test to a patient with Parkinson's Disease. (Doc. 92-3 at 4). Because of her disease, that patient suffered from "hypophonia, or reduced speech loudness." (Doc. 88-2 at 6). Dr. Bortz met with the patient on March 13, 2014, to review her test results. The patient allegedly told Dr. Bortz that Schuler had acted "frustrated" and "angry" during the testing and the patient had become upset as a result. The patient allegedly claimed Schuler had asked her to repeat her answers and that some of the tests "had to be restarted because there was an administration error." The patient believed her performance had been compromised by Schuler's behavior. (Doc. 88-2 at 6). After speaking with the patient, Dr. Bortz spoke with Schuler. During that conversation Schuler stated she had experienced "difficulty in understanding and documenting verbal responses during the examination" because of her hearing problems. (Doc. 88-2 at 10); (Doc. 88-1 at 16-17). This was the first time

---

[3] According to Dr. Bortz's declaration, she expected Schuler "would need minimal time in supervision in training. However, [that] was not the case." (Doc. 88-2 at 3). Dr. Bortz had to provide Schuler "extensive feedback on test-administration and patient rapport-maintenance skills." Schuler does not dispute that Dr. Bortz took issue with her test administration skills from the beginning of her employment, before Dr. Bortz or anyone else at Banner was aware of her hearing difficulties.

anyone at Banner was aware Schuler suffered from hearing difficulties.

During the March 13 conversation with Dr. Bortz, Schuler requested she be allowed to use a tape recorder during future tests. (Doc. 88-1 at 19). Schuler seemed to believe using a tape recorder would alleviate the problems she experienced due to her hearing loss. Schuler stated she had used a tape recorder at her prior employer with success. Dr. Bortz informed Schuler they would need to discuss the request to use a tape recorder with Banner's Human Resources Department. (Doc. 88-2 at 10).

After the March 13 conversation, Schuler sent Dr. Bortz an email to "review" what they had discussed. (Doc. 88-1 at 93). In that email Schuler explained she was using a hearing aid that needed "to be programmed specifically for use at [Banner's] facility and with this patient population." Until Schuler was able to do that, she stated Vadovicky should test patients "who have documented vocal concerns." The email also reiterated Schuler's request to use a "digital tape recorder for verbal sections of neuropsychological testing." (Doc. 88-1 at 93). At the end of the email, Schuler stated "Let's check back in a month or so to review……"

Dr. Bortz did not believe Banner could wait a month to resolve Schuler's needs. (Doc. 88-2 at 11). Dr. Bortz contacted her superior, Mark Loudenslagel, and informed him about Schuler's hearing difficulties. (Doc. 88-2 at 10). On March 18, 2014, Loudenslagel sent Schuler an email. Erica Wicke from Banner's Human Resources Department and Dr. Bortz were copied on that email. The email stated Wicke was going to set up a meeting "to review the suggestion [Schuler] made to help . . . with [her] hearing deficit." (Doc. 88-1 at 95). Loudenslagel explained that the meeting would be with Wicke, Dr. Bortz, and Schuler, and also explained that Wicke had requested Schuler come to the meeting "prepared . . . with a brief summary surrounding [her] hearing loss." Loudenslagel informed Schuler that the summary should include answers to a number of questions, such as the exact nature of her hearing loss, whether hearing aids helped with her hearing, and whether her hearing aids were functioning properly.[4] Schuler responded

---

[4] The questions centered on Schuler's hearing loss and did not seek medical information irrelevant to her hearing issues. *Cf. Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1115 n.6

to Loudenslagel's email, copying Wicke and Dr. Bortz, that same day.

In that response, Schuler indicated she was not interested in discussing her hearing loss or possible accommodation. Schuler's email stated, in relevant part:

> To be clear—I am not requesting an accommodation of any sort. . . . I offered to have my hearing aid looked at to see if it can be programmed to be more sensitive. I have an alternative solution [*i.e.*, tape recording] (which I previously documented in an email). I will check with the ADA to see what of these questions are necessary for me to answer. As I have already proposed a solution, I do believe that has to be looked at first—but let me check. If it is a hardship for you to allow tape recording of verbal test sections I do know you would need to prove that Banner would suffer severe losses by doing so. I will let you know when I have spoken with an Audiologist as well as an ADA representative.

(Doc. 88-1 at 94).

Wicke responded to Schuler's email by explaining Banner's "process is intended to explore all possible accommodation options (in this case we would consider the tape recording solution as one option for accommodation) and select one that works well for all parties. This is intended to ensure that we are all understanding the needs and [are] in agreement with the selected accommodation." Wicke further stated Schuler did not "necessarily need to answer the questions" outlined by Loudenslagel but Banner would "need documentation that clarifies what [Schuler's] limitations/restrictions are so that [it could] appropriately identify an accommodation." (Doc. 88-1 at 94).

The next day, March 19, 2014, Dr. Bortz sent Schuler an email regarding the planned meeting. (Doc. 88-1 at 97). Schuler responded to that email by reiterating that she had no interest in discussing her hearing loss or possible accommodations at that time. Schuler stated, in relevant part:

> I emailed [Loudenslagel] that I want to talk to an Audiologist and ADA representative BEFORE I meet with anyone regarding this!!!!!!! I will likely not be able to answer any questions until I do so anyway. This may take a few weeks. Sorry. Not willing to budge on that. Will tape any

---

(9th Cir. 2000), *vacated and remanded on other grounds*, 535 U.S. 391 (2002) (noting "employer cannot ask an employee for documentation unrelated to establishing the existence of a disability and the necessity of accommodation").

- 5 -

session you want me to, however.

(Doc. 88-1 at 96). Dr. Bortz responded that they would "need to at least informally discuss" Schuler's situation and her abilities because they had patients currently scheduled who might need to be rescheduled and they also needed to discuss how future patients would be handled. (Doc. 88-1 at 96). Schuler responded with a third statement that she was not willing to discuss any accommodation until an unidentified later date. Schuler's email stated, in relevant part:

> Please let me be clear—the answer is no. These can be tape recorded as we discussed. Violating my rights is not an option. The questions are not only intrusive, but also a bit offensive and but [sic] I cannot answer them technically without an Audiologist's input. You have observed quite a few evaluations and should have an adequate idea of what I can and cannot do. That is all I will offer you right now. Please do not ask me about this again until I have spoken with both an Audiologist and an ADA representative.

(Doc. 88-1 at 98). Dr. Bortz forwarded that email to Wicke and Loudenslagel on March 20, explaining she had "repeatedly clarified" that Schuler would not be permitted to tape record patient evaluations without obtaining formal approval. Dr. Bortz asked for advice as to how to proceed. (Doc. 88-1 at 98). The present record does not contain any evidence indicating what advice, if any, Dr. Bortz received.

While the email exchanges regarding Schuler's hearing loss were occurring, Schuler and Dr. Bortz had other disagreements as well. In addition to supervising Schuler to ensure proper testing procedures were used, Dr. Bortz was also responsible for ensuring Schuler did not work overtime hours. (Doc. 88 at 5). Dr. Bortz did not believe Schuler's workload justified overtime hours but Schuler had "logged overtime hours" or, in Dr. Bortz's view, Schuler had "exhausted her expected 40 hours per week without completing" all the tasks she should have completed. (Doc. 88 at 5). On March 21, 2014, Dr. Bortz met with Schuler to provide her "feedback regarding test administration and time management challenges." (Doc. 88-2 at 7). Dr. Bortz took notes during that meeting. Those notes reflect Schuler "[b]ecame very defensive, near yelling, disrespectful . . . including 'incidental' comment that [she] (doesn't) take BS from

- 6 -

anyone." The notes further indicate Schuler claimed the meeting was "a waste of time." On the particular topic of not working more than forty hours per week, the notes reflect Schuler stated "she would stay until she felt her work was finished." (Doc. 88-2 at 28). Schuler does not contradict Dr. Bortz's notes of that meeting. Instead, Schuler claims during the meeting she "expressed some differences of opinion with [Dr. Bortz], but there was no 'yelling.'" (Doc. 92-3 at 5).

Apparently believing Schuler was still in need of instruction, on March 25, 2014, Vadovicky observed Schuler administer some tests. Vadovicky took notes and those notes reflected a number of failings, such as Schuler not starting the test on time, the test materials not being prepared in advance, Schuler requiring the patient repeat himself multiple times, and Schuler not watching the patient for non-verbal cues. On March 26, 2014, Vadovicky met with Schuler to discuss what Vadovicky had observed. According to Vadovicky, that meeting did not go well and Schuler became "very aggressive toward [her]." In an email sent to Dr. Bortz shortly after that meeting, Vadovicky explained Schuler had become "defensive," "rais[ed] her voice," and had "ranted for 20 minutes." Schuler also allegedly made statements such as "she doubts Dr. Bortz' competency" and Dr. Bortz and Vadovicky "know nothing about human relationships." (Doc. 88-3 at 8). Schuler claims Vadovicky's recitation of that meeting is inconsistent with her "recollection of it," but Schuler does not provide any specifics. (Doc. 92-3 at 5).

Based on Vadovicky's email, Dr. Bortz sought guidance from Wicke and Loudenslagel. Dr. Bortz stated that "in addition to struggling with performance concerns and personal communications, [Schuler's] anger and disrespect is not acceptable." (Doc. 88-2 at 32). The record does not contain the advice, if any, Loudenslagel or Wicke provided to Dr. Bortz. On March 27, 2014, Dr. Bortz and Loudenslagel met with Schuler. During that meeting, Loudenslagel stressed to Schuler the need for her to take "constructive criticism and direction in a positive way." (Doc. 88-5 at 3).

On March 31, 2014, Dr. Bortz sent Schuler an email regarding a scheduled meeting to discuss Schuler's behavior during another test administration. (Doc. 88-1 at

106). That email included lengthy "notes" to structure the discussion. Some of those notes addressed the details of how certain tests should be administered. Schuler responded that some of the procedures she employed were taken directly from the testing manual. Where the manual and Dr. Bortz's instructions differed, Schuler stated she would "tend to stick to the manual." If Dr. Bortz had "issues" with that, she should contact the publisher of the manual. Schuler explained she was "bound by ethics to administer tests according to the standardization as set forth by the publishers with the exception of accomodation [sic] for patients – not to please the neuropsychologist." (Doc. 88-1 at 106).

Also on March 31, 2014, Dr. Bortz sent Schuler another email regarding a test Dr. Bortz was administering beginning at 10 a.m. that day. Dr. Bortz's email stated, in full: "Could not find a blank chart in cabinet or in bag. I'm taking in [test] forms, blank paper and the [test] Manual. Should break close to 10:30 to review in [neuroscience] office." (Doc. 88 at 7). Schuler responded:

> Not sure where [the forms] went as I had them there Thursday. I made them up – and they are ready now (9:50 a.m.) Also did not appreciate your sarcastic remark that you would need to test patient until 10:30 because the charts were not ready. This was untrue and unnecessary. I will be documenting your derogatory remarks from now on.
>
> (FYI)

(Doc. 88-2 at 38).

After receiving Schuler's emails, Dr. Bortz sent an email to Loudenslagel stating the situation with Schuler had "become untenable." Dr. Bortz stated she could not continue "spending an excess of my clinical and personal time addressing each and every interaction with [Schuler]." (Doc. 88-2 at 38). Dr. Bortz stated there remained troublesome issues regarding Schuler's testing techniques but Dr. Bortz could not meet with Schuler unless a third party was present because of Schuler's "reactivity and misinterpretation—if not frank distortion—of issues and discussions." That evening, Dr. Bortz sent another email to Loudenslagel stating she could not "in any good conscience

- 8 -

have [Schuler] see another patient under my name/signature." (Doc. 88-2 at 43).

Loudenslagel met with Schuler the following day, April 1, 2014. According to Loudenslagel, that meeting did not go well. Loudenslagel claims Schuler "did not acknowledge that she understood expectations or agree to abide by them." Because of that, Loudenslagel sent Schuler home for the day. Loudenslagel apparently was the final decision-maker and he decided to terminate Schuler effective April 2, 2014.

After she was terminated Schuler filed the present suit. After a partially successful motion to dismiss, Schuler is still pursuing claims against Banner for discrimination and retaliation under the Americans with Disabilities Act ("ADA") and section 504 of the Rehabilitation Act of 1973. Because the relevant standards under the ADA and the Rehabilitation Act are the same the Court will refer to Schuler's claims as brought under the ADA. *See Armstrong v. Davis*, 275 F.3d 849, 862 n.17 (9th Cir. 2001) (noting ADA and Rehabilitation Act are "materially identical"). Banner now seeks summary judgment on all of Schuler's remaining claims.

**ANALYSIS**

The exact claims Schuler is pursuing have never been clear.[5] Banner's motion for summary judgment describes Schuler as pursuing three claims. First, a discrimination claim based on Banner's alleged failure to accommodate her disability. Second, a discrimination claim based on her termination allegedly being due to her disability. And third, a retaliation claim. In her opposition to the motion for summary judgment Schuler accepts this description of her claims. Accordingly, the Court will analyze the claims as the parties have.

**I. Failure to Accommodate Claim Fails**

Schuler's first claim is for failure to accommodate her disability. "The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a 'qualified individual,' the employer receives adequate notice, and a

---

[5] The Court attempted to obtain volunteer counsel for Schuler but was unsuccessful. (Doc. 20).

- 9 -

reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business." *Snapp v. United Transportation Union*, 889 F.3d 1088, 1095 (9th Cir. 2018). When there is a possibility that an employee needs an accommodation, the ADA requires the employee and the employer "engage in an 'interactive process' through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee." *Id.* If the employer refuses to engage in the interactive process, it can be held liable assuming there was an available reasonable accommodation. *Id.*

While an employer can be liable for refusing to engage in the interactive process, an employee can effectively prevent such liability through her own actions. "The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and *neither side* can delay or obstruct the process." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) (emphasis added). An employer will not be liable for failing to accommodate an employee "if the employee was responsible for the breakdown in the [interactive] process." *Hill v. City of Phoenix*, 162 F. Supp. 3d 918, 928 (D. Ariz. 2016). In other words, when it is the employee, not the employer, who refuses to engage in the interactive process, the employee has no viable "failure to accommodate" claim. *See Allen v. Pac. Bell*, 348 F.3d 1113, 1116 (9th Cir. 2003) ("Because [the employee] failed to cooperate in the [interactive] process, we cannot say that [the employer] failed to fulfill its interactive duty."); *E.E.O.C. v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014) ("If an employer engages in an interactive process with the employee, in good faith, for the purpose of discussing alternative reasonable accommodations, but the employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for a failure to provide reasonable accommodations.").

Here, the undisputed evidence is that any breakdown in the interactive process was attributable to Schuler, not Banner. It is undisputed Banner first learned of Schuler's

hearing problems and need for an accommodation on March 13, 2014. Once Banner became aware of Schuler's situation, Banner tried to engage in the interactive process. On March 18, Loudenslagel sent an email to Schuler saying a meeting would be scheduled to address her needs. Schuler responded by stating she was "not requesting an accommodation of any sort" and she would not discuss the issue until she had done additional research. Wicke then sent Schuler an email explaining the importance of meeting to discuss her needs. The record does not contain any response by Schuler. Dr. Bortz then sent Schuler a separate email to schedule a meeting to discuss Schuler's needs. Schuler responded by stating she was unwilling to meet with anyone regarding her needs until she had talked to an "Audiologist and ADA representative." Schuler anticipated that would not happen for "a few weeks" and she was "[n]ot willing to budge on that." When Dr. Bortz responded they would need to at least meet "informally" to discuss Schuler's needs, Schuler responded that "the answer [was] no." Schuler asked Dr. Bortz not to bring up the issue again until Schuler had spoken with "an Audiologist and an ADA representative." Given these statements, there was a significant question whether the tape recorder was deemed by Schuler an accommodation required by law. But more importantly, there is no dispute of material fact that the breakdown in the interactive process was caused by Schuler, not by Banner.

This conclusion does not mean Schuler had an obligation to discuss immediately her situation and needs. Schuler may have been entitled to delay the interactive process while she gathered additional information. *Cf. Anderson v. Ross Stores, Inc.*, No. C 99-4056 CRB, 2000 WL 1585269, at *8 (N.D. Cal. Oct. 10, 2000) (citing cases noting employer may need time to accommodate employee). And Banner was not necessarily entitled to demand the interactive process occur solely on its schedule. But Schuler's failure to accommodate claim is premised on her belief that between March 13, 2014 and April 2, 2014, Banner did not engage in good faith in the interactive process. The only evidence from that time period consists of repeated efforts by Banner to meet with Schuler and Schuler refusing to do so. Schuler's refusal to even "informally" discuss her

- 11 -

needs meant it was impossible for Banner to do more than it did. Banner cannot be liable for failing to accommodate given that, during the relevant time period, Schuler was the party unwilling to participate in the interactive process.

While the undisputed evidence is that Schuler was responsible for the breakdown in the interactive process, Schuler's emails and briefing in this case seem to reflect a belief that she had no obligation to participate in the interactive process because she had already determined tape recording patients was the appropriate accommodation for her situation. Schuler was not entitled to unilaterally determine the appropriate accommodation. An "employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002). Schuler was not entitled to bypass the interactive process by dictating the accommodation Banner would have to provide. Therefore, Schuler's "failure to accommodate" claim fails as a matter of law.

**II. Disparate Treatment Claim Fails**

Schuler's second claim is that she was terminated because of her disability.[6] This claim is subject to the familiar burden-shifting regime requiring Schuler first "establish[] a prima facie case of discrimination." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014). If she does so, Banner must then "provide a legitimate, nondiscriminatory . . . reason for the adverse employment action." *Id.* And if Banner offers a legitimate reason, Schuler must "prove that the reason given by [Banner] was pretextual." *Id.*

---

[6] Schuler might also be making a hostile work environment claim. Assuming she is attempting to do so, Schuler has not pointed to evidence establishing she was subject to "a discriminatorily hostile or abusive environment." *Meirhofer v. Smith's Food & Drug Centers Inc.*, 415 F. App'x 806, 807 (9th Cir. 2011). Schuler has not identified instances of "severe or pervasive" harassment.
*Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). Therefore, to the extent Schuler is attempting to pursue a hostile work environment claim, Banner is entitled to summary judgment on that claim.

"[T]o state a prima facie case under the ADA, [Schuler] must show that (1) she is a disabled person within the meaning of the ADA; (2) she is a qualified individual, meaning she can perform the essential functions of her job; and (3) [Banner] terminated her because of her disability." *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999). While Banner questions whether Schuler can state a prima facie case, the Court will assume for present purposes that Schuler has done so and move on to the remaining steps. *Cf. Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) ("The requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.").

To carry its burden of providing nondiscriminatory reasons, Banner points to Schuler's allegedly poor job performance and behavior. There is undisputed evidence that, in the views of Dr. Bortz, Vadovicky, and Loudenslagel, Schuler was not performing adequately. Some of those performance concerns predated Schuler disclosing her hearing difficulties. Accordingly, Schuler's poor job performance sufficient is sufficient to shift the burden back to Schuler to prove pretext. *See Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 661 (9th Cir. 2002) (noting "poor job performance" constituted "a legitimate, nondiscriminatory reason for terminating . . . employment").

"An employee can prove pretext either: (1) directly, by showing that unlawful discrimination more likely motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1280 (9th Cir. 2017). If the employee relies on indirect evidence, that evidence must be "specific and substantial." *Id.* at 1282.

Schuler does not offer any direct evidence of discrimination, *i.e.* "evidence which, if believed, proves the fact of [discriminatory animus] *without inference or presumption.*" *Id.* Instead, Schuler attempts to prove pretext indirectly by claiming the patient

complaints about her performance were fabricated and Banner has changed its justifications for terminating her. Neither argument is convincing.

Schuler's own emails indicate she was aware of the difficulties she had with the Parkinson's patient and in hearing patients in general. Schuler points to no evidence undermining Banner's position that patients complained about Schuler. Moreover, the patient complaints were not at the time, and are not now, the primary basis on which Banner terminated Schuler's employment. Thus, whether patients complained is of little relevance.

Schuler claims the reason Banner has offered for her termination has shifted over time. If that were accurate, Schuler might be able to avoid summary judgment. But Banner's reason for terminating Schuler has not changed. The poor job performance reason Banner offers now is the same reason Banner offered at the time of Schuler's termination. That reason is also well-documented in contemporaneous records. It is undisputed Schuler was having difficulty performing her job in the way in which Banner expected. For example, Dr. Bortz asked to meet with Schuler to discuss some issues she identified while observing Schuler's performance and at least one patient complained that Schuler's performance had negatively impacted the patient's tests. Importantly, both of those events occurred before Dr. Bortz and Banner learned Schuler had a disability. Once Banner was aware of Schuler's disability, Schuler refused to engage in the interactive process and her performance issues persisted such that both Dr. Bortz and Vadovicky continued voicing their concerns. And Schuler's own emails establish she had a strained relationship with Dr. Bortz.

Banner's reason for terminating Schuler has never changed and Schuler has not pointed to any probative evidence of pretext. An employer is free to terminate an at-will employee who, in the employer's view, is not performing as expected and is difficult to interact with on a personal level. Therefore, Schuler's discrimination claim fails as a matter of law.

**III. Retaliation Claim Fails**

Schuler's final claim is for retaliation. As with her discrimination claim, the retaliation claim is subject to a familiar burden shifting regime requiring a prima facie case, nondiscriminatory reasons offered by the employer, and then proof of pretext by the employee. Again, Schuler's claim fails based on the final step regarding pretext.

A prima facie case of retaliation requires a plaintiff to show: "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004). There is a substantial question whether Schuler engaged in protected activity. Schuler claims she engaged in protective activity when she disclosed her hearing loss and when she complained about "hostility" by Dr. Bortz during the March 27 meeting. Schuler's act of disclosing her disability may not qualify as protected activity.[7] And Schuler does not explain how her alleged complaints about generic "hostility" at the March 27 meeting qualify as protected activity. For simplicity, however, the Court will assume Schuler engaged in protected activity.

Next, there is no question Schuler suffered an adverse employment action in that she was fired shortly after engaging in the alleged protected activity. Finally, the causal link likely is satisfied given the temporal proximity of a few weeks between the alleged protected activity and the adverse employment action. *See Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th Cir. 2003) (temporal proximity is sufficient if the protected activity and adverse action are "very close" in time). Thus, the Court will assume Schuler has made out a prima facie case of retaliation.

Banner offers the "legitimate reason" for terminating Schuler that she had poor job performance. That reason is well-documented in the record and is sufficient to shift the burden back to Schuler to point to some evidence of pretext. Schuler has not done so.

As with her discrimination claim, Schuler points to no evidence indicating Banner's reason for her termination was pretextual. It is undisputed that Banner viewed

---

[7] Given Schuler's insistence that she did not want any accommodation, it is unclear what protected activity Schuler believes she engaged in that supports her retaliation claim. *See Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004) (protected activity consists of "[p]ursuing . . . rights under the ADA").

Schuler as not adequately performing her job and it is undisputed that Banner's employees believed it was difficult to work with Schuler. Schuler has not pointed to "specific, substantial evidence of pretext." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994). Therefore, her retaliation claim fails.

Accordingly,

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 87) is **GRANTED**. The Clerk of Court is directed to enter judgment in favor of all Defendants.

Dated this 30th day of July, 2018.

Honorable Roslyn O. Silver
Senior United States District Judge